UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No.: 17-5354 (DSD/DTS)

Kimberly Stewart,

        Plaintiff,

v.

        **ORDER**

Qwest Corporation,
d/b/a CenturyLink QC,

        Defendant.

    Anja M. Sivertson, Esq., Alf E. Sivertson, Esq. and Law Offices of Sivertson & Barrette, PA, 1465 Arcade Street, St. Paul, MN 55106, counsel for plaintiffs.

    Sarah E. Crippen, Esq., Ashleigh M. Leitch, Esq. and Best & Flanagan LLP, 60 South 6th Street, Suite 2700, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon the motion for summary judgment by defendant Qwest Corporation, d/b/a CenturyLink QC. Based on a review of the file, record, and proceedings herein, the court grants the motion.

**BACKGROUND**

This employment action arises out of plaintiff Kimberly Stewart's resignation from Qwest on August 23, 2017. Stewart began working at Qwest in 2015 as a credit consultant. Sivertson Aff. Ex. 1. Kevin Barrett supervised Stewart at all times relevant to this action. Barrett Dep. at 8:14-9:3. Stewart's daily schedules, breaks, absences, and leave requests were managed by Patricia

Farris in Qwest's resource allocation specialist department (RAS). Farris Dep. at 6:19-7:8-8:12, 10:19-13:20. Farris was supervised by Shelley Reinhardt, manager of RAS. Id. at 17:19-24.

## I. Workers' Compensation Claim

Stewart had a latent neck injury when she started work at Qwest. Stewart Dep. at 32:9-33:6. At some point during her tenure, Stewart's injury flared up and she began missing work due to pain and doctors' appointments. Stewart exhausted all of her Family Medical Leave Act time on October 3, 2016, and filed a claim for short term disability benefits with Qwest's benefits administrator, Sedgwick. Leitch Decl. Ex. K.

Stewart then filed a workers' compensation claim with Sedgwick on January 26, 2017. Stewart Dep. at 40:1-4, 140:22-143:5. She also asked Barrett for a new chair to help alleviate her pain. Id. at 142:9-17. Sedgwick referred Stewart to the claims department, which told her that she needed to work directly with Barrett to file a workers' compensation claim. Id. at 143:10-144:25. Barrett then told her that she needed a note from her doctor in order to start the claims process and to get a new chair. Id. at 145:3-9. Stewart gave Barrett a note from her doctor at the end of January or early February and Barrett agreed to order her a new chair, which Stewart received in May.[1] Id. at 145:14-25, 146:18-19. Stewart's workers' compensation claim was denied, however. Id. at

---

[1] It is unclear why it took so long to receive the chair.

2

146:5-17.

Stewart also requested stretch breaks to help ease the pain. Id. at 146:23-147:3. After initially denying the request, Qwest agreed to allow Stewart to take breaks throughout the day without pay. Id. at 147:9-11. Stewart continued to accrue many absences throughout the spring of 2017 due to her neck pain, despite having no additional FMLA time left. See Leitch Decl. Exs. E, F, J, L, & N. She also failed to work mandatory overtime in March. Id. Ex. I. In April 2017, Stewart met with Barrett, human resources, and her union representative to discuss her repeated absences from work. See id. Exs. E and F. Qwest informed Stewart that additional absences could result in termination. Id. Ex. E at 3-4; Barrett Dep. at 19:23-21:5.

**II. Whistle Blower Activity**

Stewart alleges that in February 2017 she first reported concerns about Qwest's billing and collection practices to Barrett. Stewart Dep. at 167:14-168:25. She specifically noted her concern that Qwest was fraudulently billing for equipment customers had already returned or never ordered.[2] Id. at 165:20-166:6, 181:5-25, 190:3-14. Barrett told her to transfer those kinds of calls to the billing department because the collections department did not address "mischarged items on a bill." Id. at 169:6-13; Barrett

---

[2] Stewart can only recall two specific instances of such customer calls, one in February and one in June 2017. Id. at 172:6-25, 174:8-13.

3

Dep. at 48:4-17. Stewart felt that as a manager Barrett should have handled the calls himself and that his failure to do so allowed the fraudulent activity to continue. Id. at 169:6-13. Barrett recalls Stewart having questions about certain billing issues, but does not recall that she was concerned that Qwest was engaged in fraud. Barrett Dep. at 45:19-46:10.

Despite her belief that Qwest was defrauding customers, Stewart did not file an internal complaint with Qwest. Qwest employees may make anonymous reports of alleged wrongdoing online or via telephone through its compliance hotline, Integrity Line. Id. at 52:12-21. Stewart claims that she wanted to complain about the fraudulent billing, but was blocked from Integrity Line's website and did not have time to call its twenty-four hour toll-free number.[3] Stewart Dep. at 175:21-176:17, 177:4-178:2. Stewart also believed that reporting the fraud would be futile, but she does not fully explain why. Id. at 178:3-10. She did not report the alleged fraud to anyone else at Qwest. Id. at 179:8-11. Stewart's "whistle blowing" was limited to her instant messages and direct conversations with Barrett in February and June 2017. Id.

---

[3] Stewart has submitted a screen shot to establish that she was purposefully blocked from using Integrity Line's web-based system. Sivertson Aff. Ex. 10. Although the screen shot shows a message saying that the web page is "blocked," there is no supporting evidence to establish that Qwest was somehow trying to restrict Stewart's access to Integrity Line or her ability to file a complaint. Indeed, as discussed later, Qwest opened an Integrity Line investigation in August 2017 after Stewart complained that she was assaulted by Farris.

at 193:14-194:8.

**III. Retaliation**

Stewart alleges that she was subject to retaliation by Qwest from January 2017 until she quit on August 23, 2017, because she filed a workers' compensation claim and engaged in whistle blowing as set forth above. The instances of retaliation include:

- Barrett twice hit her desk in April 2017 and joked that she was being fired after formal discussions about her repeated absences, Stewart Dep. at 203:7-204:13;

- Farris, Reinhardt, and employees in the human resources department repeatedly asked her if she was having surgery for her neck, id. at 205:10-13;

- Barrett's supervisor Nick Boyer told her that she was crazy on two or three occasions, id. at 205:17-25, 206:12-17, 209:2-3;

- Farris and Reinholdt "sneered" at her and made fun of her clothing two or three times, id. at 208:16-210:16;

- Reinhardt often screamed at her while she was in the restroom to get back to work, id. at 198:17-199:25;

- Farris waited outside the restroom and eavesdropped on her conversation with other employees, id. at 273:1-274:18;

- She attempted to give a doctor's note to Farris, but Farris knocked it out of her hand, id. at 161:5-19.

In addition, Stewart alleges that Farris assaulted her on two occasions.[4] First, in April 2017, Farris approached her after she

---

[4] Because the court must consider Stewart's and Farris's version of the alleged assaults in determining whether genuine issues of material fact exist, the court will not consider the declarations of Stewart's co-workers, Demetria Blakely and Sylvia Dunn, which are at best cumulative. See Sivertson Aff. Exs. 6 and 7.

5

requested vacation time.[5] Id. at 45:29-46:4-9. Farris patted her on the neck and poked her while asking where it hurt. Id. at 46:4-9. Farris also said "you have cancer." Id. at 46:9-13. Stewart attempted to report the incident and other harassment via Integrity Line, but had difficulty doing so. Id. at 95:22-97:21; Sivertson Aff. Ex. 9. Barrett tried to help her complete her report, but for reasons that are unclear it was never fully submitted. Stewart Dep. at 96:2-97:21. Stewart ultimately called the Integrity Line on April 11, and reported harassment by Farris and Reinhardt because of her many absences due to her neck injury. Leitch Decl. Ex. N. She did not complain about retaliation for filing a workers' compensation claim or whistle blowing, nor did she complain that Farris assaulted her. See id. Qwest investigated the complaint, concluding that no action was required because there was no policy violation. Id. at 6. Qwest noted, however, that it would accommodate her medical restrictions. Id. at 5.

Second, at 11:20 a.m. on August 23, 2017, Farris jabbed and poked Stewart's neck, repeatedly asking "where does it hurt." Id. at 18:3-7; Sivertson Aff. Ex. 11. Stewart asked her to stop many times, but Farris continued to jab and poke her. Sivertson Aff. Ex. 11. Farris acknowledges that she touched Stewart on the right shoulder, but maintains that she did so to comfort her. Farris Dep.

---

[5] Stewart made the request to Barrett who referred it to Farris despite Stewart's request that she not be involved. Id. at 45:18-46:5.

6

at 41:2-42:3. Farris recalls Stewart responding that it hurt, and Farris told her that she was sorry she was in so much pain. Id. at 41:12-17. Stewart complained to Barrett about the incident, who acknowledged that Farris had assaulted Stewart previously. Sivertson Aff. Ex. 11. Barrett than asked Stewart to attend a party to celebrate his promotion. Stewart Dep. at 58:7-14. Stewart took a cigarette break and attended the party before returning to her desk. Id. at 71:14-17. At that point, although she was shaken up by Farris's conduct, Stewart did not intend to resign from Qwest. Id. at 71:17-20. Stewart ran into Farris at the elevator after the incident. According to Stewart, Farris asked if she had hurt her and Stewart told her to get away. Stewart Dep. at 66:16-25. Farris recalls apologizing to Stewart and that Stewart responded cordially. Farris Dep. at 43:16-21.

At 4:00 p.m. that day, Stewart sent an email to Barrett and Qwest management titled "Retaliation due to workerscomp [sic]." Sivertson Aff. Ex. 11. In the email, Stewart described the incident with Farris, stated (for the first time) that she felt she was being retaliated against for filing a workers' compensation claim, and announced that she was leaving for the rest of the day due to neck pain. Id. Stewart did not intend to resign at that point. Stewart Dep. at 72:19-22.

The next day, Stewart called Qwest to report that she was still in pain and would be absent. Id. at 108:1-12. She requested that Barrett call her back. Id. Barrett was out of the office that day, so Farris called her back instead. Id. at 106:24-25. Stewart told Farris that she would not be coming to work that day. Id. at 105:6-8. Despite the cordial tone of the call,[6] Stewart interpreted it as taunting and testified that she feared for her life. Id. at 105:8-9. After the call, Stewart decided to quit her job. Id. at 117:12-18.

Later that morning, Stewart sent an email to Barrett and Pam Lawton, a recruiter in Qwest's HR department, complaining about Farris's conduct the day before and that she is being retaliated against for filing a workers' compensation claim.[7] Leitch Decl. Ex. C at 3. Lawton responded that someone from HR would contact her soon. Id. at 2. Stewart replied by providing her lawyer's contact information. Id. On August 25, Qwest informed Stewart that her complaint was forwarded to Integrity Line for investigation. Id. at 1. Later that day, Stewart's lawyer notified Qwest that Stewart would not return to work and stated that she had been constructively discharged. Leitch Decl. Ex. V.

---

[6] The court has listened to the recording of the call. Leitch Decl. Ex. T.

[7] Stewart did not mention her alleged whistle blowing activities. See id.

8

## IV. This Action

On December 5, 2017, Stewart commenced this suit against Qwest in Ramsey County District Court, and Qwest timely removed. Stewart then filed an amended complaint alleging that Qwest retaliated against her in violation of Minnesota law for filing a workers' compensation claim and for reporting alleged fraudulent billing practices.[8] Qwest now moves for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party.

---

[8] The magistrate judge recently granted Stewart's request to amend her complaint again to include a claim for punitive damages under Minn. Stat. §§ 549.191, 549.20. ECF No. 36. Stewart filed a second amended complaint on December 13, 2018. ECF No. 39.

9

Id. at 255. The nonmoving party, however, may not rest on mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Retaliation**

Minnesota prohibits "[a]ny person [from] discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits." Minn. Stat. § 176.82, subdiv. 1. "This statute prohibits two specific types of conduct: retaliatory discharges (or threatened discharges) and obstructions of workers' compensation benefits." Flaherty v. Lindsay, 467 N.W.2d 30, 32 (Minn. 1991). Minnesota likewise prohibits an employer from terminating employment because the employee in good faith reports a violation or suspected violation of any federal, state, or common law or rule to an employer, any governmental body, or law enforcement official. Minn. Stat. § 181.932, subdiv. 1(1).

To establish a prima facie case of retaliation under either statute, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal connection between the two events. Ciszewski v. Eng'd Polymers Corp., 179 F. Supp. 2d 1072, 1092 (D. Minn. 2001) (citing Kunferman v. Ford Motor Co., 112 F.3d 962, 965 (8th Cir. 1997)); Dietrich v. Can. Pac. Ltd., 536 N.W.2d 319, 327 (Minn. 1995)); Gee v. Minn. State Colls. & Univs., 700 N.W.2d 548, 555 (Minn. Ct. App. 2005). The court will focus its analysis on whether Stewart suffered an adverse employment action and the required causal connection, and will assume for purposes of this motion that she engaged in protected activity.[9]

### A. Adverse Employment Action

Stewart alleges that she was constructively discharged from Qwest which constitutes an adverse employment action. "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." Fercello v. Cty. of Ramsey, 612 F.3d 1069, 1083 (8th Cir. 2010) (internal quotation marks and citation omitted). "The bar to relief, however, is high." Id. (citation omitted). To establish constructive discharge, a plaintiff must show (1) a reasonable person in her situation would find the working conditions intolerable, and (2) the

---

[9] Qwest analyzed only whether Stewart had suffered an adverse employment action and did not address the other two elements.

employer intended to force her to quit.  Id.  Qwest argues that Stewart has established neither element.  The court agrees.

### 1. Working Conditions

Stewart must show that a reasonable person in her situation would find the working conditions intolerable. Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 796 (8th Cir. 1996). The intolerability of working conditions is judged by an objective standard, not Stewart's subjective feelings. West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497-98 (8th Cir. 1995). The record does not support a finding that Stewart's working conditions were intolerable. Even taken as true, Stewart's complaints of poor treatment primarily by Farris and Reinhardt and occasionally by Barrett and Boyer, at most establish that her work environment could be unpleasant. But the Eighth Circuit has held that "[c]onstructive discharge requires considerably more proof than an unpleasant and unprofessional environment." Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002). "A feeling of being unfairly criticized or having to endure difficult or unpleasant working conditions do not constitute intolerable working conditions." Carlson v. Extendicare Health Servs., Inc., No. 05-1438, 2006 WL 2069254, at *8 (D. Minn. July 26, 2006). Further, stray comments, petty slights or a standoff attitude are not actionable retaliation. Burkhart v. Am. Railcar Indus., Inc., 603 F.3d 472, 477 (8th Cir. 2010).

12

Indeed, the facts of this case stand in stark contrast to the only case Stewart relies on, Henderson v. Simmons Foods, Inc., 217 F.3d 612 (8th Cir. 2000). In Henderson, the Eighth Circuit held that the plaintiff had established objectively intolerable working conditions because she was subjected to months of persistent and continuous "crude sexual vulgarities," sexual assaults, and obscene gestures by several co-workers that, although continually reported, were not addressed by the employer. Id. at 617. Here, the allegations, while unpleasant, do not rise to the level present in Henderson.

The record in this case also shows that Qwest attempted to resolve Stewart's concerns in good faith. Her complaints in April 2017 were investigated through Integrity Line. And Qwest opened an investigation in August 2017 following the incident with Farris, but Stewart chose to quit rather than participate in the investigation. See Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998) ("If an employee quits without giving her employer a reasonable chance to work out a problem, then she has not been constructively discharged."). Under these circumstances, Stewart has not met her burden to establish an objectively intolerable work environment.

### 2. Intention

An employee can establish her employer's intent to force her to quit through direct evidence or through evidence that "the

13

employer ... could have reasonably foreseen that the employee would [quit] as a result of its actions." Wright v. Rolette Cty., 417 F.3d 879, 886 (8th Cir. 2005) (alteration in original) (internal quotation marks and citations omitted). Here, there is no direct evidence that Qwest intended to force Stewart to quit, so the court must consider whether there is evidence that her resignation was "reasonably foreseeable" given Qwest's actions. Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101, 3 F.3d 281, 285 (8th Cir. 1993).

The record read as a whole does not support a finding that Qwest intended to force Stewart to quit. To the contrary, it appears that Qwest made reasonable efforts to keep Stewart as an employee - from accommodating her need for frequent absences, breaks, and a new chair due to her neck to investigating concerns raised through Integrity Line. There is simply no evidence that Qwest engaged in a concerted campaign to secure Stewart's resignation. Nor is it plausible that Qwest could have reasonably foreseen Stewart's resignation.

### B. Causal Connection

Although not addressed by the parties, the court also finds that Stewart has not established a causal connection between her alleged protected activity and any adverse employment action. None of the comments Stewart describes as retaliatory reference her workers' compensation claim, nor does it appear that anyone besides

14

Barrett was aware of that claim.  In fact, Farris - the chief aggressor according to Stewart - testified that she was unaware that Stewart had filed a workers' compensation claim and Stewart has submitted no evidence to the contrary.  See Farris Dep. at 29:6-30:5.  Further, Stewart herself did not allege any connection between her mistreatment and her workers' compensation claim until August 23, 2017, one day before she resigned.  Causation is likewise lacking with respect to Stewart's alleged whistle blowing about fraudulent billing practices.[10]  Stewart alleges that she had conversations in person and via instant messenger with Barrett on two occasions about billing customers for returned or never-purchased equipment.  Stewart did not report the alleged fraud to Integrity Line or any other person or department at Qwest.  There is no evidence that Farris, Reinhardt, or anyone else who allegedly harassed Stewart was aware that she had raised the issue with Barrett.  Absent such knowledge, there can be no causation.  As a result, Stewart has also failed to make a prima facie showing of causation.

---

[10]  Again, absent argument by the parties to the contrary, the court will assume that Stewart's questions to Barrett about Qwest's billing practices constituted statutorily protected activity. Given the casual and limited nature of her questions, however, the court is not convinced that Stewart can properly be considered a whistle blower.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. The motion for summary judgment [ECF No. 18] is granted; and

2. The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 20, 2018

s/David S. Doty  
David S. Doty, Judge  
United States District Court